IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


OCEANEERING INTERNATIONAL, INC., §
§
     Plaintiff, §
§
v. §      CIVIL ACTION NO. H-11-3447
§
CROSS LOGISTICS, INC., §
§
     Defendant. §


**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

**TABLE OF CONTENTS**

<u>**Title**</u>                                                                    <u>**Page**</u>

**Findings of Fact** . . . . . . . . . . . . . . . . . . .     1

    Enterprise's Subsea Umbilical 10923 . . . . . . . .     1

    Mariner's Project at the Garden Banks 72 Platform. .     3

    Commencement of the Work . . . . . . . . . . . . .     6

    The Events of January 9, 2009 . . . . . . . . . . .     7

    How and Where the 10923 Umbilical Was Fouled . . . .    12

    Cross's Negligence . . . . . . . . . . . . . . . . .    15

    Enterprise's Response to its Maritime Tort Loss . .    21

    Enterprise's Recoverable Damages for its Maritime
    Tort Loss Caused by Cross . . . . . . . . . . . . .    24

    Oceaneering's Negligence Claim (Second Cause
    of Action) . . . . . . . . . . . . . . . . . . . .    26

    Oceaneering's Contractual Claim for Defense and
    Indemnity (First Cause of Action) . . . . . . . . .    28

    The Platform Processing Agreement . . . . . . . . .    28

    The Main Contract, the Back to Back Contract,
    and Purchase Order on This Job . . . . . . . . . .    33

        (1)  The Main Contract . . . . . . . . . . . .    33

        (2)  The Back to Back Contract . . . . . . . .    36

        (3)  The Purchase Order . . . . . . . . . . . .    38

    Enterprise Asserts a Claim Against Mariner
    Instead of Cross . . . . . . . . . . . . . . . . .    39

    Reasons Oceaneering Paid the $4,679,639.88
    Demanded by Enterprise . . . . . . . . . . . . . .    46

i

Oceaneering's Breach of Contract Claim (Third
Cause of Action) . . . . . . . . . . . . . . . . .   49

Cross's Counterclaims  . . . . . . . . . . . . . .   50

**Conclusions of Law**  . . . . . . . . . . . . . . . .   51

Negligence (Oceaneering's Second Cause of Action). .   52

Oceaneering and Mariner Have No Vicarious
Liability . . . . . . . . . . . . . . . . . . . .   53

Damages for Negligence . . . . . . . . . . . . . .   55

The Validity of Enterprise's Assignment of its
Negligence Claim to Oceaneering  . . . . . . . . .   59

Contractual Indemnity (Oceaneering's First Cause of
Action) . . . . . . . . . . . . . . . . . . . . .   62

Breach of Contract (Oceaneering's Third Cause of
Action) . . . . . . . . . . . . . . . . . . . . .   66

Prejudgment Interest . . . . . . . . . . . . . . .   69

**Conclusion and Order**  . . . . . . . . . . . . . . .   72

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OCEANEERING INTERNATIONAL, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-3447 |
| | § | |
| CROSS LOGISTICS, INC., | § | |
| | § | |
| Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After approximately five days of trial, all parties rested and closed the evidence, and the Court having considered the evidence, the trial briefs, and the oral arguments and authorities of counsel, now makes the following Findings of Fact and Conclusions of Law pursuant to FED. R. CIV. P. 52.

## Findings of Fact

The **Findings of Fact** are made from a preponderance of the evidence, both direct evidence and a significant amount of circumstantial evidence, after having heard and considered all witnesses and judged their credibility, plus the testimony of additional witnesses received in evidence by depositions, together with numerous exhibits received at trial.

### Enterprise's Subsea Umbilical 10923

1.    Plaintiff Oceaneering International, Inc. ("Oceaneering") seeks to recover from Defendant Cross Logistics, Inc. ("Cross") damages for the severance of a subsea umbilical 10923 on January 9, 2009, during Defendant Cross's offshore retrieval of its barge's port stern No. 4 anchor.   The subsea umbilical belonged to Enterprise Products Partners, L.P., Enterprise Field Services L.L.C. ("Enterprise Field Services"), and Flextrend Development Company L.L.C. (collectively, "Enterprise").   Enterprise subsequently sold and transferred to Oceaneering all rights of action, "whether in tort, contract or otherwise," that Enterprise had against Defendant Cross arising out of the "damage and cost of replacement" of the umbilical.

2.    Enterprise is the leaseholder and/or operator of Outer Continental Shelf ("OCS") Lease No. 12631, and the owner and/or operator of wells and facilities in the Garden Banks 72 area in the Gulf of Mexico.   Enterprise Field Services was in the owner group that owned the Garden Banks 72 platform with its processing facilities and, as well, was the operator of the platform itself.

3.    The Garden Banks 72 platform was affixed to the sea floor in approximately 514 feet of water.   Garden Banks 117 wells Nos. 1 and 2, of which Enterprise was owner and/or operator, were located approximately 3.96 miles to the southeast of the Garden Banks 72 platform, in 915 feet of water.

4.   Those two wells were serviced by control umbilicals laid on the sea floor for that distance of about 3.96 miles from the Garden Banks 72 platform to subsea umbilical termination assemblies ("SUTAs") at the respective well sites.

5.   The foregoing two umbilicals were identified as umbilicals 10923 (to Well No. 2) and 10929 (to Well No. 1).  They were laid within a 200-feet wide right-of-way on either side of an 18" flow pipeline, and their as-laid positions were plotted and on file with the Bureau of Ocean Energy Management Regulation and Enforcement.

6.   Umbilical 10923 was laid new in or about 1993 and had a design life of approximately eight years.  It was composed of various materials including numbers of steel tubes that fulfilled various functions such as communications, chemical injection, and the like.

7.   At least one of the tubes used for paraffin in the 10923 had failed by 2008 and could not be used, and new umbilicals had since been manufactured that were twice as strong and far more corrosion-resistant but, even after approximately 15 years of use, Enterprise still had its 10923 umbilical in service as of late August or early September, 2008, when it closed down operations in advance of Hurricanes Gustav and Ike.

<u>Mariner's Project at the Garden Banks 72 Platform</u>

3

8.    Apache Deepwater L.L.C. (successor by merger to Mariner Energy, Inc.) ("Mariner"), a company separate from Enterprise, also had operations on the Garden Banks 72 platform in connection with is own offshore facilities producing in a separate OCS lease of which Mariner was the leaseholder and/or operator.

9.    Mariner was not in the Garden Banks 72 platform owner group, but was a producer that contracted to use the owner group's processing facilities on the platform.

10.    Mariner planned to install an 8" oil riser and 12" pull tube at the Garden Banks 72 platform for use in connection with production from its own wells.  Mariner had in force and effect an offshore master service contract ("Main Contract") with Plaintiff Oceaneering dated July 31, 1998.  In March, 2008, Oceaneering delivered to Mariner a day rate proposal for diving services to perform the installation work pursuant to the Main Contract.

11.    After receiving from Mariner a purchase order for the work, Oceaneering entered into a back-to-back subcontract agreement ("Back to Back") with Defendant Cross Logistics, Inc. ("Cross") dated July 31, 2008, to procure from Cross the utilization of one of its barges to support Oceaneering's work for Mariner at the platform.  The Back to Back mutually conferred upon Oceaneering and Cross all of the corresponding rights, obligations, and liabilities that Mariner and Oceaneering had with respect to each other in the Main Contract.

4

12.   To perform its work as Oceaneering's subcontractor, Cross utilized its barge, the Crossmar 14, with a 4-point anchoring system for mooring offshore alongside the Garden Banks 72 platform. It is from the Crossmar 14 that Oceaneering's divers would conduct their subsea installation work for Mariner.

13.   Cross hired Fugro Chance, Inc. ("Fugro") to perform, among other services, specialized offshore survey services to identify various subsea assemblies, structures, and equipment, including pipelines, flowlines, umbilicals, and others, to provide data to Cross to facilitate the designation of anchor drop zones for the Crossmar 14 anchors, and to generate real time GPS data in support of Crossmar 14's deployment and recovery of her anchors.

14.   Fugro provided maps showing the charted subsea assets in the vicinity of Garden Banks 72, including the right-of-way where Enterprises's 10923 umbilical, 10929 umbilical, and the 18" flow line were all charted as having been laid.

15.   Cross chartered an anchor handling tug, Miss Jessica, to tow the Crossmar 14 to and from the work site at the platform and to assist Crossmar 14 with anchor handling operations.   The Crossmar 14 was not a self-propelled vessel and therefore was dependent on the Miss Jessica for its navigation.

16.  Cross had anchoring handling procedures for the Crossmar 14, which provided for an anchor exclusion zone with respect to subsea pipelines.  The policy provided for an exclusion

5

zone of 500 feet if the vessel and its anchor were on the same side of the pipeline.  If the anchor was dropped on the other side of the pipeline from the location of the vessel, however, then the exclusion zone between the anchor and the right-of-way was to be 1,000 feet.

17.  Cross's policy provided that an anchor should not be permitted to enter the anchor exclusion zone after the anchor has been deployed.

<u>Commencement of the Work</u>

18.  Cross mobilized the Crossmar 14 to the designated work site at Garden Banks 72 platform on August 19, 2008.  About ten days later operations were closed down as Hurricane Gustav, the second most destructive Atlantic hurricane of 2008, entered the Gulf of Mexico, and the Crossmar 14 recovered her anchors and was towed back to shore.

19.  Up until the end of August and early September, when operations were closed down, there is no evidence that Enterprise's 10923 umbilical was not still functioning.

20.  Hurricane Gustav made landfall near Cocodrie, Louisiana, on September 1, and already Hurricane Ike was moving across the Atlantic Ocean.  A massive storm with a huge wind field, Hurricane Ike entered the Gulf of Mexico on September 9, finally making landfall near Galveston, Texas on September 13.

21.   Dozens   of   offshore   platforms   suffered   damages from Hurricane Ike, including the Garden Banks 72 platform.   On September 17, the Crossmar 14 was returned to the Garden Banks 72 platform, but by September 23 Oceaneering concluded that the topside damages to the platform were so severe that its diving services could not be resumed.   The Crossmar 14 was towed back to shore, and operations did not resume until on or about December 6.

22.   Crossmar 14 was again mobilized to the Garden Banks 72 platform on December 6-7, December 16-20, December 29-January 3, 2009, and January 8-9, and thereafter as Oceaneering continued its work for Mariner.

23.   On or about March 23, 2009, when Enterprise attempted to operate its 10923 umbilical, it found that it was inoperative.

24.   The parties subsequently determined that Enterprise's 10923 umbilical had been severed and was, in fact, the umbilical that had been raised to the surface on the Crossmar 14 port stern anchor No. 4 on January 9, 2009, and which, at the time, all parties thought was simply trash from off the sea floor.

The Events of January 9, 2009

25.   When   on   location   at   Garden   Banks   72   platform   on January 9, 2009, the Crossmar 14 was starboard to the south face of the platform; her bow to the west; her starboard stern No. 3 anchor was set to the northeast; her starboard bow No. 2 anchor was set to

7

the northwest; her port bow No. 1 anchor was set to the southwest; and her port stern No. 4 anchor was set to the southeast, and on the east side of the designated 200 feet right-of-way.

26.   The weather forecast for January 9 called for heavy weather from the south-southeast, which meant that diving operations would need to be suspended and the Crossmar 14 moved to shore.

27.   The Crossmar 14 logs show at 0900 hours winds were out of the southeast at 15-20 knots, seas were 2-4 feet; at 1500 hours winds were out of the southeast at 15-20 knots, seas were 3-4 feet; by 1800 hours winds were out of the southeast at 20-25 knots, seas were 4-6 feet; and by 2100 hours winds were out of the southeast at 25-30 knots, seas were 5-7 feet, with occasional 9 feet.

28.   Oceaneering ended its diving operations in mid-afternoon on January 9 and its diving bell was secured on the Crossmar 14 by 1746 hours.  The Crossmar 14 instructed the Miss Jessica to recover in sequence the starboard stern No. 3 anchor, the starboard bow No. 2 anchor, and the port bow No. 1 anchor.

29.   The Crossmar 14 at all times planned to recover the port stern No. 4 anchor by winching to the anchor on the seabed and not to use the Miss Jessica to recover the anchor.

30.   The Miss Jessica recovered the starboard stern No. 3 anchor and returned it to the Crossmar 14, and then did the same with the starboard bow No. 2 anchor.

31.  Close to the time that the Miss Jessica picked up the port bow No. 1 anchor, the Crossmar 14 began winching the barge in a south-southeasterly direction toward the port stern No. 4 anchor and into the prevailing seas and wind.

32.  The anchor recovery plan required the Crossmar 14 to continue on that course--to back down over the port stern No. 4 anchor--and then lift the anchor from the seabed vertically, recovering the port stern anchor to the barge.

33.  At approximately 2020 hours, the No. 4 anchor began to slip on the sea floor, causing the Crossmar 14, which was at that time well east of the right-of-way, to begin drifting in a north-northwesterly direction under the influence of the prevailing winds and sea.

34.  The Crossmar 14 over the next 15 minutes, more or less, drifted some 1,800 feet generally in a north-northwesterly direction and back across the right-of-way to its westerly side.

35.  At approximately 2035 hours, and due to unknown forces which the parties variously argue was either the No. 4 anchor snagging the 10923 umbilical laying outside of its right-of-way, or the 10923 umbilical already snagged by the No. 4 anchor from within the right-of-way and now recoiling from the stresses imposed on it after it was fouled, or a sudden calming or reversal of winds and seas, or a combination of some such factors, the Crossmar 14's direction of drift changed and it began moving in an easterly

direction for a distance of about 550 feet, crossing the right-of-way again over to its easterly side.

36.   Throughout the time that the Crossmar 14 drifted to the north-northwest, and then to the east, the Crossmar 14 continued to winch in her No. 4 anchor.  During this time the Crossmar 14 still was not under the effective control of the Miss Jessica.

37.   At 2040 hours, the Crossmar 14 was approximately 200 feet to the east of the right-of-way when the No. 4 anchor neared the surface, enabling Cross's crew to observe that the anchor had ensnared something, and later--with the aid of a small remotely operated vehicle (ROV)--to see a "bird's nest" of cables and material tangled in the flukes and shank of the anchor.

38.   Cross's personnel, as well as Oceaneering's personnel onboard the Crossmar 14, believed at the time that the "bird's nest" was trash from off the ocean floor.

39.   The event was reported, and Mariner commissioned Oceaneering to survey the area and search for damage.  Three days after the accident, Oceaneering set out with a new vessel, the Ocean Intervention II, and on January 13 and 14, Oceaneering made a subsea umbilical survey along the eastern side of the right-of-way--the side closest to where the No. 4 anchor had been dropped--to determine if the umbilical on the eastern side of the 18" pipeline had been disturbed or snagged by the anchor.  This survey tract was about one mile along in the exact vicinity where

10

the Crossmar 14 snagged the "bird's nest," and examined the 3" umbilical 10929, which was charted to lay on the eastern side of the 18" pipeline.   The 10929 was found to be in place and undisturbed.

40.   The surveyors did discover at about 600-700 feet southeast of the platform an unidentified umbilical crossing the 10929, which Oceaneering followed to the east until they reached its tattered end.   Oceaneering then retraced this umbilical remnant back toward the platform until it disappeared under a new pipeline that had been laid by Mariner.   The surveyor did not suspect at the time that this was the 10923 umbilical, which some months later was determined to be the fact.

41.   Assuming at the time that the only umbilical that could have been fouled was Enterprise's 10929 laid to the east of the pipeline, Oceaneering did not survey the west side of the pipeline, where the 10923 was charted.

42.   The same subsea survey showed some sea floor disturbance about 1,700 feet to the northwest of where the No. 4 anchor had been dropped and about 350 feet to the west-northwest of where the Crossmar 14 was located at 2020 hours when it began drifting to the north-northwest.

43.   Months later, after Enterprise discovered the 10923 umbilical was not operative, it was determined that it was

11

Enterprise's 10923 that was snagged and brought to the surface on
the Crossmar 14's No. 4 anchor on the night of January 9.

## How and Where the 10923 Umbilical Was Fouled

44.   The subsea survey made on January 14 established that the 10929 umbilical was within the right-of-way and to the east of the 18" pipeline as it had been charted, and that it was not damaged by the events of January 9.

45.   There is no direct evidence that prior to the incident on January 9 the 10923 umbilical was not located where it had been laid and charted within the right-of-way.

46.   When the No. 4 anchor began slipping along the ocean floor, causing the Crossmar 14 to begin an involuntary reversal of course and drift to the north-northwest under the influence of the winds and seas from the southeast, the Crossmar 14 continued to reel in the anchor.

47.   The Crossmar 14 drifted under the influence of the sea and winds across and to the west of the right-of-way.   At the approximate time when the anchor was about to be raised off of the ocean floor, the confluence of surface and subsea forces, including the heaves and pitch experienced by the barge while reeling in the anchor in seas with swells of up to eight feet, enabled the anchor fortuitously to pass over the 10929 umbilical and 18" pipeline but then, unfortunately, to foul the 10923 umbilical before being winched in sufficiently to remove the anchor from the sea floor.

48.   As the Crossmar 14 continued to winch in the No. 4 anchor, the stresses upon the 10923 umbilical became severe.   The

13

stress and friction caused the umbilical to begin to fray and caused various cables within the umbilical to become entangled further in and between the flukes and shaft of the anchor, forming a tangled "bird's nest" out of the umbilical, but not severing the umbilical in two.

49.  At 2035 hours, whether from an unexpected change in the seas and wind or from a recoil of the now severely stressed 10923 umbilical, or some combination thereof, the barge moved in an easterly direction for a distance of approximately 550 feet where, at 2040 hours, the barge winched the No. 4 anchor almost to the surface.  Cross's personnel onboard the Crossmar 14 then barely saw the shank of the anchor with its ensnared "bird's nest," which was the 10923 umbilical.

50.  After the Miss Jessica took control of the barge, the crew inspected the umbilical with an ROV, and attempted unsuccessfully to raise the ensnared anchor with the barge's crane. Finally, at about 2206 hours, the Miss Jessica began to tow the barge toward port in a north-northeasterly direction, which caused the 10923 umbilical to sever completely.  The "bird's nest" fell from the anchor, and the Crossmar 14 was able to recover its No. 4 anchor.  The Miss Jessica then returned the Crossmar 14 to harbor.

51.  Subsequent surveys of the sea floor in early June located both of the two severed ends of the 10923 umbilical on the sea floor, both positioned consistent with the umbilical having been

14

completely severed far to the east of the right-of-way and in an area consistent with where the Miss Jessica assumed control over the Crossmar 14 and began towing it in a north-northeasterly direction.

52. The subsea surveys showed that more than one mile of severed umbilical had been pulled out from the right-of-way in the direction of where the Crossmar 14 raised the 10923 umbilical to the surface.  The tension on the southern portion of the 10923 umbilical was sufficient to pull the umbilical taut over its entire length, dragging and burying the SUTA, which was more than three miles away, and suspending the umbilical above a dip in the ocean floor for a span of more than 270 feet at its southern end.

53. The improbability of the anchor while being winched-in not to have snagged the 10929 umbilical and the pipeline before fouling the 10923 umbilical on the west side of the pipeline is not so great as the improbability of the 10923 umbilical somehow having been previously moved by unknown forces from out of the charted right-of-way and over to the east of both the 18" pipeline and the 10929 umbilical, especially given the absence of any reported allisions or fouling events during the several months since Enterprise had last used the 10923 umbilical in production operations at the end of August or early September, 2008.

54. Hurricane Ike, as vast as that storm was and as close as the eye came to Garden Banks 72 platform (30-50 miles), did not

15

cause the umbilical 10923 to be moved to the other side of both the 18" pipeline and the sister umbilical 10929 at a depth of more than 500 feet of water, while at the same time leaving umbilical 10929 undisturbed in the right-of-way.

55.   On January 8, when the Crossmar 14 dropped its anchors to set up at the Garden Banks 72 platform, and the next day on January 9, when it began to retrieve those anchors in the late afternoon, the 10923 umbilical was within the charted right-of-way and lay on the west side of the 18" pipeline.

56.   The 10923 umbilical was in its charted position when it was fouled by the No. 4 anchor of the Crossmar 14.

57.   Cross had knowledge of the location of the 10923 umbilical and has not rebutted the presumption of negligence that arose when Cross's drifting vessel allided with the stationary umbilical.

## Cross's Negligence

58.   At the time of the accident, Mike Sampey, Jr. was Cross's barge superintendent on duty aboard the Crossmar 14, and he was responsible for ensuring the safety of the operations and of all persons onboard.   Thus, as superintendent, Sampey owed a duty of care to the crew and passengers of the Crossmar 14, including the Oceaneering divers and other workers.   Sampey was also responsible, in behalf of Cross, to ensure that the Crossmar 14 did not damage

nearby surface or subsea assets, including the fixed platform and the related umbilicals and pipelines in the Garden Banks 72 area.

59.   Robert Aucoin was Cross's deck foreman on duty aboard the Crossmar 14, but on the evening of January 9 he was in the tower, as tower operator--operating the anchor winch.

60.   Alan Charlson was Oceaneering's superintendent onboard, in charge of Oceaneering's diving operations and work for Mariner on installing the 8" oil riser and 12" pull tube.  Charlson was aware of 15 pipelines and seven umbilicals that came into this site at the Garden Banks 72 platform.  Charlson also knew that Oceaneering's work needed to be performed from the south side of the platform, which is why the Crossmar 14 when on location was always anchored to the south face of the platform.

61.   On the morning of January 9, with a forecast of heavy weather approaching, Sampey desired to retrieve anchors and return to shore, but Oceaneering's Charlson wanted to complete a dive, which is not unusual given the date rate of $70,000 per day that Oceaneering paid to Cross for use of the barge, whether it was onsite at the platform or not.

62.   Sampey was in command of the vessel and the final decision-maker on when to retrieve anchors and return to shore, but desiring to accommodate Cross's customer Oceaneering, he acquiesced to Charlson's preference and Oceaneering's dive continued until about 1500 hours, when Charlson decided to cease diving operations.

17

The "bell," which is the pressurized capsule in which the divers are lowered to the required depths, was secured back on the Crossmar 14 at about 1746 hours.

63. Mark Dean, Fugro's survey party chief who was onboard the Crossmar 14 on January 9, monitored and operated Fugro's survey equipment and received the real time GPS monitoring on the location and movement of the Crossmar 14 and the Miss Jessica. Dean was in the tower discharging that responsibility during the anchor retrieval process on January 9.

64. Cross's Aucoin was also in the tower to operate the anchor winches.

65. During anchor retrieval operations, Superintendent Sampey customarily was in the control tower to give oversight and to command retrieval operations. The Crossmar 14 was shorthanded on the evening of January 9, however, which required the deck foreman Aucoin--instead of acting as foreman on the deck--to be in the tower to operate the anchor winch. Superintendent Sampey, therefore, instead of providing command from the tower, was down on the deck substituting for Aucoin as deck foreman to monitor visually the anchor retrievals.

66. Sampey had been employed by Cross for about four years. He worked as a welder for Cross and then became a deck foreman on the Crossmar 14. After two years as a deck foreman, Cross promoted Sampey to superintendent in command of the vessel. He received

18

anchoring training by watching others, and had had experience with numerous successful anchor drops and retrievals during the time of his employment.

67.  Sampey, however, had no prior experience with an anchor slipping on the Crossmar 14, and Cross had not specifically trained him on what to do in the event that an anchor began slipping while backing down on it across valuable, charted subsea assets, as happened in this case.

68.  The appropriate response--to avoid fouling subsea assets by dragging an anchor across the seabed and into subsea assets--is to "come out from under the wire," that is, to let out the anchor wire and thereby leave the anchor where it is on the seabed, rather than to imperil the subsea assets.

69.  Had Superintendent Sampey known that the anchor was slipping, he testified that he would have called an all-stop and started to let out the anchor wire as just described to safeguard the subsea assets.

70.  Superintendent Sampey, however, was not in the control tower to monitor the real time GPS screen displaying the Crossmar 14's location and movement, and he was therefore unaware that the anchor was slipping.

71.  Robert Aucoin, Cross's winch operator in the tower, saw on the screen the GPS data showing that the barge was drifting away from the anchor drop location, which meant the anchor had slipped,

19

but there is no evidence that Aucoin called Sampey to report that fact, and Sampey does not recall having received any such call from Aucoin.

72. When the anchor began slipping on the seabed about 2020 hours, the Miss Jessica was about a half mile distant from the Crossmar 14 and, while the Miss Jessica had lifted the port bow No. 1 anchor to the tug and secured it, the approximately half mile of No. 1 anchor wire extending from the tug to the barge gave the Miss Jessica virtually no effective control over the Crossmar 14, which was then in an anchorless drift.

73. Had Superintendent Sampey ordered Aucoin not to begin winching in the No. 4 anchor until the port bow No. 1 anchor wire was reeled in to or near the barge, the Miss Jessica then would have been in proximity to the Crossmar 14 so that if the No. 4 anchor began to slip, the Miss Jessica could control the Crossmar 14 to prevent it from drifting into and across the right-of-way while dragging the No. 4 anchor and risking an allision with the subsea assets.

74. Instead of waiting for the Miss Jessica to approach the Crossmar 14 while reeling in the anchor wire on the No. 1 anchor, however, Sampey began the process of backing down on the No. 4 anchor while the Miss Jessica was still well more than a half mile away.

75. Had Superintendent Sampey maintained his command position in the tower, he would have seen the real time GPS data showing the No. 4 anchor was slipping and, in the exercise of ordinary care, would have called an all-stop, and ordered the anchor wire let out to avoid the fouling of Enterprise's subsea assets.

76. The Crossmar 14 and its Superintendent Sampey were negligent in executing the anchoring retrievals on January 9, 2009, and Defendant's negligence was the proximate cause of the Crossmar 14's No. 4 anchor fouling the subsea umbilical 10923, and Enterprise's resulting property damages.

77. Mariner had a company man onboard, Kip Harzman, to give oversight to Oceaneering's diving work when the Crossmar 14 was anchored at the platform and installation work was in progress.

78. There is no evidence that Harzman was on deck or involved in any manner with Cross's attempted anchor retrieval of the port stern No. 4 anchor.

79. Oceaneering's superintendent onboard, Alan Charlson, was in charge of its diving operations and all installation work when the Crossmar 14 was anchored at the platform.

80. Charlson was inside his room on the Crossmar 14 and not involved in any manner with Cross's attempted anchor retrieval of the No. 4 anchor.  Charlson knew of no problem until Sampey came to Charlson's room, told him that the anchor---then just below the water's surface--had fouled something, and asked if an Oceaneering

21

diver could go in to see what had been snagged.  Charlson said the sea was too rough to send his diver into the water, and suggested that Sampey use an ROV to inspect, which was done.

81.  At no time did Harzman or Charlson, or any other personnel of Mariner or Oceaneering, either have or assert any control over Cross's efforts to retrieve the Crossmar 14's anchors on January 9, 2009.

82.  Oceaneering, which neither had nor asserted any control over Cross's anchoring retrieval practices employed by the Crossmar 14, was not negligent with respect thereto and was not a contributing cause of the fouling of the 10923 umbilical.

83.  Mariner, which neither had nor asserted any control over Cross's anchoring retrieval practices employed by the Crossmar 14, was not negligent with respect thereto and was not a contributing cause of the fouling of the 10923 umbilical.

## Enterprise's Response to its Maritime Tort Loss

84.  Upon receiving the results of the subsea surveys of the severed 10923 umbilical, which included photographs and descriptive reports of the extreme stresses that had been inflicted upon the umbilical before it was finally severed, Enterprise soon determined not to attempt a repair of the severed umbilical but rather to replace it with a new umbilical, fabricated with better materials and much stronger, and with a much longer design life of 20 years.

22

85.    The factors considered by Enterprise in choosing to lay a new umbilical included the reserves of oil and gas that Enterprise expected to recover in Well No. 2 in coming years; the advanced age of the 10923 umbilical, which already had far exceeded its design life and had suffered a failure of at least one paraffin tube; and the high expense of repairing the 10923 umbilical, which would not be substantially different than the expense of acquiring a new umbilical but which would entail greater risks given the extraordinary stresses to which the 10923 umbilical had been subjected and the possibility that ultimately it might prove to be incapable of being restored to serviceable condition.

86.    It was reasonable for Enterprise to replace the 10923 umbilical rather than to attempt to repair it.

87.    The 10923 umbilical was a distinct subsea asset used to facilitate the operation of the subsea Garden Banks 117 Well No. 2 from the Garden Banks 72 platform nearly four miles away.  It was not an integral part of the platform itself nor of the wellhead, and would not have to be replaced even if (hypothetically) either the platform or the equipment at the wellhead required replacement.

88.    Enterprise preferred to abandon the old umbilical in place, which would have reduced its damages, but that option was denied by the United States Mineral Management Service. Enterprise's damages therefore included the cost of removal and disposal of the severed remnants of the 10923 umbilical.

23

89.   Enterprise   contracted   with   Plaintiff   Oceaneering   to recover the damaged umbilical from the ocean floor, which it did. It disposed of the shorter segment, and rolled up and delivered to a storage yard in Florida the longer segment, but did not save the frayed, unraveled ends of either remnant where the umbilical had been severed.

90.   Neither the shorter segment that was destroyed nor the longer segment that was maintained on a reel in storage has any salvage value beyond the additional cost required finally to dispose of the materials as scrap.

91.   Enterprise acted reasonably to mitigate its losses.

92.   Enterprise issued requests for proposals to replace the umbilical, but did not issue a uniform set of specifications upon which each of those parties submitting proposals was able to bid. The three or four proposals Enterprise received therefore had variations in scope and other details and could not be compared in the way that side-by-side bids on a common set of specifications can be compared.

93.   Enterprise   subjectively   decided   that   Oceaneering's proposal was the most competitive received, and there is no evidence to the contrary.

94.   Enterprise therefore chose Oceaneering to furnish and install a new umbilical from the platform to Well No. 2, which it did, and, from November 2009 through October 2010, Enterprise paid

24

to Oceaneering a total of $3,795,340 for its work, which included removal of the damaged 10923 umbilical from the ocean floor and fabrication and installation of its replacement.

95.  Oceaneering's customary profit margin for its work was approximately 15%, and Oceaneering earned a profit of approximately $569,000.00 on this replacement project.

96.  In addition to the sums paid to Oceaneering, Enterprise calculated that it incurred another $884,299.00 in expenses for various consultants, engineering firms, the use of a helicopter, the ROV umbilical inspection survey done by McMoRan, and even for salaries paid to its own regular employees.  When that sum was added to the amount paid separately to Oceaneering, Enterprise claimed total damages in the amount of $4,679,639.88.

97.  When the work was completed and the new umbilical placed into service, Enterprise had a brand new umbilical fabricated with improved materials, which was much stronger, and with a design life of 20 years.  Hence, the new replacement of the old 10923 umbilical was a betterment in that it substantially extended the expected useful life of Enterprise's subsea umbilical.

<u>Enterprise's Recoverable Damages for its</u>
<u>Maritime Tort Loss Caused by Cross</u>

98.  As a distinct subsea asset and with evidence of its age and that one tube already had failed, depreciation of the 10923 umbilical is a factor properly considered in connection with

25

determination of Enterprise's damages caused by Cross's maritime tort.

99.  The major documented cost of acquiring and installing the new umbilical in place of the severed 10923 umbilical, including the required removal of the old umbilical from the ocean floor, was $3,795,340, which Enterprise paid to Oceaneering.  Enterprise's claim for additional damages of $884,299 incurred to acquire and to place in service the new umbilical was not refuted in the evidence.

100. The percentage of useful life extension--the betterment Enterprise received with its new umbilical--must therefore be applied to Enterprise's total proven calculated costs of $4,679,639.

101. According to Oceaneering's expert damages witness, whose opinion on this point is credible, the 10923 umbilical had an expected useful life of 25 years when it was installed in 1993. When it was severed as a result of Cross's negligence in January, 2009, it had been in service for 16 years.  The 10923 umbilical therefore had a pre-severance remaining expected useful life of 9 years.

102. The much-improved new umbilical has a design life of 20 years, which would support an inference of a longer useful life based on the 10923 umbilical having had a longer expected useful life than its design life of only 8 years.  Nonetheless, in the absence of direct evidence of a longer expected useful life for the

new umbilical, its expected useful life is found to be at least equal to its design life of 20 years.

103. As a result of the replacement umbilical, the remaining expected useful life of this subsea asset was extended from 9 years to 20 years, an extension of 11 years, which was a material and the principal betterment received by Enterprise.  The percentage of useful life extension is thus 11/20, or 55%, which--even in this very conservative analysis--is a very substantial betterment. (*See* COL Nos. 21-24, *below* at pp. 57, 58).

104. Applying the percentage of useful life extension (55%) to Enterprise's total replacement cost of $4,679,639 nets the sum of $2,573,801 as the value of the new umbilical's extended useful life for the benefit of Enterprise. (*See* COL No. 21).

105. Deducting the value of the extended useful life of the new umbilical ($2,573,801) from Enterprise's total damages of $4,679,639, establishes Enterprise's recoverable damages caused by Cross's negligent fouling and destruction of Enterprise's 16 years old umbilical: $2,105,838. (*See* COL Nos. 22, 28).

Oceaneering's Negligence Claim
(Second Cause of Action)

106. In a three-party (Enterprise, Oceaneering, and Mariner) Settlement Agreement with Grant of Subrogation and Assignment dated November 15, 2010 ("Settlement Agreement"), Enterprise did "convey, sell and transfer to Oceaneering . . . all rights, claims, causes

27

of action and/or rights of action . . . in tort . . . that may or could be alleged . . . [against] Cross and/or the CROSSMAR 14, her appurtenances, engines, gear, and tackle, in respect of the damage and cost of replacement of the Garden Banks [10923] umbilical."

107. The Settlement Agreement recites that Oceaneering agreed to pay to Enterprise simultaneously with execution of the Settlement Agreement, "in cash, in lump sum, without discount" the total sum of $4,679,639.88 for the releases given and assignments made by Enterprise to Oceaneering.

108. Oceaneering, as the purchaser and transferee of Enterprise's maritime tort claim against Cross, alleges in its Second Cause of Action that it is entitled to recover from Cross the full sum of $4,679,639.88, plus interest, as a "result of the negligence and/or fault of Cross and the Crossmar 14 and/or unseaworthiness of the Crossmar 14 as a consequence of the improper retrieval of the port stern anchor."

109. Enterprise's recoverable maritime tort damages sustained as a proximate cause of Cross's negligence, however, are $2,105,838, plus prejudgment interest.  (FOF Nos. 98-105).

110. Oceaneering, as the purchaser/transferee/assignee of Enterprise's maritime tort cause of action against Cross, is entitled to recover from Cross no greater amount of damages than Enterprise was entitled to recover from Cross.

111. Oceaneering is entitled to recover from Cross on the assigned negligence claim the sum of $2,105,838, plus prejudgment interest.

### Oceaneering's Contractual Claim for Defense and Indemnity
(First Cause of Action)

112. Cross had no contractual relationship with Enterprise, and Enterprise had no breach of contract claims against Cross to "convey, sell and transfer" to Oceaneering in the Settlement Agreement.

113. Oceaneering alleges a right to contractual indemnity from Cross, however, pursuant to the Purchase Order issued by Mariner to Oceaneering and the Back to Back between Oceaneering and Cross.

114. Oceaneering's breach of contract for indemnity claim requires examination not only of the Main Contract (between Mariner and Oceaneering and Mariner's Purchase Order with the indemnity clause issued to Oceaneering), and the Back to Back between Oceaneering and Cross, but also of the contractual arrangements between Enterprise--whose umbilical was damaged--and Mariner.

### The Platform Processing Agreement

115. Enterprise and Mariner, among others, had in force and effect a Platform Processing and Limited Right of Use Agreement dated effective December 1, 2008 (hereinafter "Platform Processing Agreement"), which contractually governed their commercial

29

relationship relevant to the Garden Banks Block 72 platform and processing facilities on the platform.  Oceaneering introduced in evidence excerpts from the Platform Processing Agreement--but not the entire contract--and the Findings of Fact that follow necessarily rely on the excerpts in evidence.

116. Enterprise Field Services and other third parties, individually and collectively, are described in the Platform Processing Agreement as "Owners." Mariner was not an owner of the platform but paid Owners for certain services and processing of its production on the platform, and is identified as one of the "Producers."

117. Section 11.2(b) of the Platform Processing Agreement, inserting the names of the parties involved here, provides:

> (b) <u>OWNER PROPERTY</u>.  NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, OWNERS [Enterprise] RELEASE, DISCHARGE AND ACQUIT THE PRODUCER GROUP [Mariner and its contractors and subcontractors] AND OWNERS [Enterprise] WILL FULLY DEFEND, FULLY INDEMNIFY AND HOLD THE PRODUCER GROUP [Mariner, Oceaneering, Cross] HARMLESS FROM AND AGAINST ALL LOSSES, BY WHOMEVER BROUGHT, BASED ON PROPERTY DAMAGE OR LOSS OF TANGIBLE PROPERTY, INCLUDING THE PLATFORM, OWNER FACILITIES, PROCESSING FACILITIES, AND OTHER FACILITIES OWNED BY OWNERS [Enterprise] AND LOCATED ON GARDEN BANKS BLOCK 72, WHENEVER OCCURRING, SUFFERED OR INCURRED BY THE OWNER GROUP [Enterprise] ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, IN WHOLE OR IN PART, REGARDLESS OF WHETHER SUCH LOSS IS OCCASIONED BY OR THE RESULT IN WHOLE OR IN PART OF THE NEGLIGENCE OR FAULT OR STRICT LIABILITY, WHETHER SOLE, CONCURRENT, JOINT, ACTIVE, OR PASSIVE, OF THE PRODUCER GROUP [Mariner, Oceaneering, Cross], EXCEPT TO THE EXTENT SUCH PROPERTY DAMAGE OR LOSS IS CAUSED BY THE GROSS

NEGLIGENCE OR WILLFUL MISCONDUCT OF PRODUCER GROUP [Mariner, Oceaneering, Cross]. NOTWITHSTANDING THE FOREGOING, WITH RESPECT TO THE ABOVE-DESCRIBED PROPERTY DAMAGE OR LOSS THAT IS IN CONNECTION WITH INSTALLATION OR START-UP ACTIVITIES OF PRODUCER GROUP [Mariner, Oceaneering, Cross] UNDER THIS AGREEMENT (WHETHER NOW OR HEREAFTER OCCURRING), AND TO THE EXTENT SUCH PROPERTY DAMAGE OR LOSS IS CAUSED OR ARISES OUT OF THE FAULT OR NEGLIGENCE OF ANY MEMBER OF PRODUCER GROUP [Mariner, Oceaneering, Cross], THE OBLIGATIONS OF OWNERS [Enterprise] DESCRIBED IN THIS PARAGRAPH SHALL NOT BE APPLICABLE AS TO THE FIRST $10,000,000 OF PROPERTY DAMAGE OR LOSS.

118. In the foregoing section 11.2(b), Enterprise releases Mariner, its contractors and subcontractors, and agrees to indemnify them for all property losses and damage sustained by Enterprise, arising out of or in connection with the Platform Processing Agreement, including damage to the platform located in Garden Banks Block 72, which is defined in Exhibit A of the Agreement, to include "the equipment, facilities, and fixtures . . . located on or affixed to such structure and owned by [Enterprise]." The foregoing release and indemnification clause expressly excepts from its coverage, however, the first $10 million of Enterprise's losses caused by or arising out of the fault or negligence of Mariner, its contractors and subcontractors in connection with installation activities.

119. Enterprise's 10923 umbilical terminated at the Garden Banks Block 72 platform and, necessarily, was affixed thereto, and the loss sustained by Enterprise from the severance of its

31

umbilical arose out of or in connection with Mariner's installation activities to add an 8" oil riser and a 12" pull tube and subsea spool at the Garden Banks Block 72 platform.

120. Because it is uncontroverted that Enterprise's property damage to its 10923 umbilical was occasioned by Mariner's installation operation and the damages did not exceed the amount of $10 million, Enterprise's release and indemnification under § 11.2(b) does not apply to release Mariner, Mariner's contractor Oceaneering, or the latter's subcontractor Cross, from liability for Enterprise's property loss or damage "caused by or arising out of the fault or negligence" of Mariner, Oceaneering, or Cross.

121. Hence, Enterprise did not release Cross from liability for Enterprise's property loss caused by Cross's fault and negligence in its attempted retrieval of the Crossmar 14's No. 4 anchor on January 9, 2009, and Cross's tort liability has been found above in Findings of Fact Nos. 1 through 105.

122. There is no evidence that the fouling of Enterprise's 10923 umbilical during Mariner's installation activity was caused by or arose out of any fault or negligence on the part of Mariner or its contractor, Oceaneering.

123. Mariner did not negligently cause damage to Enterprise's umbilical or commit any maritime tort for which it was liable to Enterprise. (*See also* FOF Nos. 77, 78, 81, 83).

124. Oceaneering did not negligently cause damage to Enterprise's umbilical or commit any maritime tort for which it was liable to Enterprise. (*See also* FOF Nos. 79-82).

125. As found above (FOF No. 112), because Cross, an independent subcontractor of Oceaneering, had no contract with Enterprise and hence no contractual liability to Enterprise for having caused property damage to Enterprise's 10923 umbilical, Cross's liability to Enterprise is founded solely in tort.

126. Oceaneering had no contract with Enterprise to indemnify or hold harmless Enterprise for any property loss or damage sustained by Enterprise during installation work that was caused by the fault or negligence of an independent subcontractor, in this instance, Cross.

127. Although the $10 million exclusion under § 11.2(b) of the Platform Processing Agreement excepts Mariner from § 11.2(b)'s release and indemnity for Enterprise's property losses and damages (*see* FOF Nos. 117-120), Mariner in the Platform Processing Agreement assumes no liability or obligation to hold harmless or to indemnify Enterprise for Enterprise's property losses and damages arising in connection with the Platform Processing Agreement that are caused by the negligence or fault of a third party, an independent contractor, or an independent subcontractor, and without any fault or negligence on the part of Mariner.

33

128. Mariner had no contract with Enterprise to indemnify Enterprise for any property loss or damage sustained by Enterprise during installation work that was caused by the fault or negligence of an independent contractor or its independent subcontractor, in this instance, Cross.

129. There is no evidence that Enterprise has or had any cognizable claim against Mariner--either in contract or in tort--based upon the tortious conduct of Cross which acted at all times as an independent subcontractor.

<u>The Main Contract, the Back to Back Contract,</u>
<u>and Purchase Order on This Job</u>

(1) The Main Contract

130. Mariner had in force and effect an OFFSHORE MASTER SERVICE CONTRACT ("Main Contract") with Oceaneering dated July 31, 1998. (*See also* FOF Nos. 10, 11).  In March 2008, Oceaneering submitted a day rate proposal to Mariner to perform diving services pursuant to the Main Contract for Mariner's installation of an 8" oil riser and 12" pull tube and subsea spool at the Garden Banks Block 72 platform.  On award of the work, Mariner issued Purchase Order No. 2113-2199 dated March 27, 2008 to Oceaneering.

131. To provide vessel support for Oceaneering to perform its obligations under the Main Contract and Purchase Order, Oceaneering

34

entered into a Back to Back Subcontract Agreement ("Back to Back")
with Cross dated July 31, 2008.

132. Pursuant to the Back to Back, Oceaneering and Cross have
the same rights, obligations, and limitations with respect to each
other as Mariner and Oceaneering have to each other under the Main
Contract and Purchase Order.

133. Section 8 of the Main Contract states that Oceaneering
"shall be an independent contractor with respect to the performance
of all work provided and services rendered hereunder, and . . .
Mariner shall have no direction or control over [Oceaneering] or
its employees, agents, contractors, or subcontractors except in the
results to be obtained."

134. Correspondingly, under the Back to Back, Cross was an
independent contractor with respect to all work provided and
services rendered by Cross, and Oceaneering had no direction or
control over Cross except in the results to be obtained.

135. The Main Contract, as amended July 26, 1999, includes
Section 13, entitled: "Release, Hold Harmless and Indemnity
Obligations."  Sections 13.B and 13.D, read as follows:

B.   LIABILITY FOR CONTRACTOR'S PROPERTY

CONTRACTOR [Oceaneering] RELEASES THE MARINER GROUP
FROM   ANY   LIABILITY   TO   CONTRACTOR   FOR,   AND
CONTRACTOR SHALL DEFEND, INDEMNIFY, AND HOLD THE
MARINER GROUP HARMLESS FROM AND AGAINST ALL SUITS,
ACTIONS, CLAIMS, AND DEMANDS, BY WHOMEVER BROUGHT,
BASED   ON   PROPERTY   DAMAGE   OR   LOSS,   WHENEVER
OCCURRING, SUFFERED OR INCURRED BY CONTRACTOR, AND

35

THE OFFICERS, EMPLOYEES, AGENTS, AND REPRESEN-
TATIVES OF CONTRACTOR, ARISING FROM OR RELATED IN
ANY WAY TO PERFORMANCE OF THE WORK HEREUNDER,
REGARDLESS OF HOW SUCH DAMAGE OR LOSS IS CAUSED,
AND EVEN IF CAUSED BY THE NEGLIGENCE, WHETHER SOLE
OR CONCURRENT, OR ACTIVE OR PASSIVE, OR OTHER LEGAL
FAULT, INCLUDING STRICT LIABILITY, OF THE MARINER
GROUP.

* * *

D.   LIABILITY FOR MARINER'S PROPERTY

MARINER RELEASES THE CONTRACTOR GROUP [Oceaneering
and its subcontractors] FROM ANY LIABILITY TO
MARINER FOR, AND MARINER SHALL DEFEND, INDEMNIFY,
AND HOLD THE CONTRACTOR GROUP HARMLESS FROM AND
AGAINST, ALL SUITS, ACTIONS, CLAIMS, AND DEMANDS,
BY WHOMEVER BROUGHT, BASED ON PROPERTY DAMAGE OR
LOSS, WHENEVER OCCURRING, SUFFERED OR INCURRED BY
MARINER, AND THE OFFICERS, EMPLOYEES, AGENTS, AND
REPRESENTATIVES OF MARINER, ARISING FROM OR RELATED
IN ANY WAY TO PERFORMANCE OF THE WORK HEREUNDER,
REGARDLESS OF HOW SUCH DAMAGE OR LOSS IS CAUSED,
AND EVEN IF CAUSED BY THE NEGLIGENCE, WHETHER SOLE
OR CONCURRENT, OR ACTIVE OR PASSIVE, OR OTHER
LEGAL FAULT, INCLUDING STRICT LIABILITY, OF THE
CONTRACTOR GROUP.

136. In the foregoing quoted clauses, Oceaneering releases and
agrees to indemnify Mariner from any liability for claims and
demands based on property damage or loss suffered by Oceaneering
arising from work done under the Main Contract, even if
Oceaneering's property loss or damage is caused by the negligence
of Mariner itself.

137. Likewise, Mariner releases and agrees to indemnify
Oceaneering and its subcontractors--in this case, Cross--from any
liability for claims and demands based on property loss or damage

suffered by Mariner arising from work done under the Main Contract, even if Mariner's damage or loss is caused by the negligence of Oceaneering or its subcontractors--in this case, Cross.

138. There is no evidence that Mariner suffered any property loss or damage arising from or related to any work performed by Oceaneering or its subcontractor Cross under the Main Contract.

139. Mariner sustained no property loss or damage from work performed by Oceaneering and Cross under the Main Contract in connection with installation of the 8" oil riser and 12" pull tube, and subsea spool at Garden Banks 72.

140. If Mariner had sustained any such property loss or damage caused by Oceaneering or it subcontractor Cross, Mariner released Oceaneering and Cross from all liability for such. (*See* FOF Nos. 135, 137).

(2) The Back to Back Contract

141. The Back to Back Contract between Oceaneering and Cross states:

> 1.   Owner [Cross] will act as a subcontractor to Charterer [Oceaneering] in accordance with the relevant terms and conditions of the Main Contract (as contained within Appendix A hereto) on a "back to back" principle.
>
> 2.   "Back to Back" shall mean that the Charterer [Oceaneering] and Owner [Cross] shall have the same rights, obligations, liabilities and limitations with respect to each other as Company [Mariner] and Contractor [Oceaneering]

37

have to each other under the Main Contract, including any amendments thereto, applied Mutatis Mutandis with the substitutions of "Charterer" for "Company," "Owner" for "Contractor."

3. FOR THE AVOIDANCE OF DOUBT, CHARTERER [Oceaneering] SHALL EXTEND TO OWNER [Cross] THE BENEFITS OF INDEMNITIES AND HOLD HARMLESS PROVIDED BY COMPANY [Mariner] UNDER THE MAIN CONTRACT AND EACH PARTY HERETO SHALL INDEMNIFY AND HOLD THE OTHER HARMLESS (TO INCLUDE PARENT OF OR SUBSIDIARY COMPANIES, SUBCONTRACTORS OF ANY TIER AND THEIR RESPECTIVE EMPLOYEES AND FROM AND AGAINST LIABILITY FOR INJURY TO, OR DEATH OF THEIR PERSPECTIVE [sic] PERSONNEL AND FOR LOSS OF, OR DAMAGE TO THEIR RESPECTIVE PROPERTY TO INCLUDE ALL CLAIMS, DEMANDS, PROCEEDINGS AND CAUSES OF ACTION RELATING THERETO, ARISING OUT OF, OR IN CONSEQUENCE OF, THE PERFORMANCE OF THE WORK REGARDLESS OF WHETHER CAUSED OR CONTRIBUTED TO, IN WHOLE OR IN PART, BY THE SOLE OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR FAULT OF EITHER PARTY.

142. The foregoing clauses of the Back to Back adopt the identical release and indemnity concept found in the Main Contract.

143. Hence, under Section 13.D of the Main Contract--as applied in the Back to Back--Oceaneering released Cross and its subcontractors for all claims of property loss or damage suffered by Oceaneering caused by the negligence of Cross and its subcontractors related to the performance of the work under the Main Contract for installation of an 8" oil riser and 12" pull tube and subsea spool.

144. There is no evidence that Oceaneering suffered any property loss or damage arising from or related to performance of

work by Cross or its subcontractors under the Back to Back and Main Contract.

145. Oceaneering sustained no property loss or damage from the work performed by Cross and its subcontractors to provide vessel support under the Back to Back and Main Contract.

146. If Oceaneering had sustained any such property loss or damage caused by Cross or its subcontractors, Oceaneering released Cross and its subcontractor from all liability for such. (*See* FOF Nos. 141–143).

### (3) The Purchase Order

147. The Purchase Order dated March 27, 2008, issued by Mariner to Oceaneering, included the following clause:

> 9.   **Indemnity**:
>
> Seller [Oceaneering] does hereby indemnify and save harmless Buyer [Mariner] . . . from and against all liability to others and all claims, causes of action and suits of other, . . . for . . . property damage, arising out of acts or omissions to act of employees, contractors, or agents of Seller [Oceaneering]. . . .

148. The parties are agreed that the Purchase Order was mutually accepted by Oceaneering and Cross as a part of the Back to Back Contract to which they agreed on July 31, 2008.

149. Under the Indemnity Clause of the Purchase Order, Oceaneering covenants to indemnify and save harmless Mariner

39

against "all liability to others" for property damage arising out of the act of Oceaneering or its contractors, in this case, Cross.

150. Under the Back to Back, the Purchase Order's Indemnity Clause binds Cross to indemnify and save harmless Oceaneering against all liability to others for property damage arising out of the acts of Cross.

## Enterprise Asserts a Claim Against Mariner Instead of Cross

151. Enterprise had a cognizable maritime tort claim for $2,105,838 against Cross for the property damage it sustained as a result of Cross's negligence. (*See* FOF Nos. 1-105, 109).

152. Instead of lodging a claim against the tortfeasor Cross, however, Enterprise made demand upon Mariner to compensate it for the damages caused by the negligence of Cross.

153. Mariner did not negligently cause Enterprise's property damage. (*See* FOF Nos. 77, 78, 81, 83, 123).

154. The Platform Processing Agreement--although not *releasing* Mariner from liability for property damage or loss to Enterprise caused by Mariner or a subcontractor (*see* FOF Nos. 117-120, 127, 128)--discloses no covenant or promise by Mariner *to indemnify* Enterprise for maritime tort damages done to Enterprise's property by an independent subcontractor, such as occurred here.

40

155. Mariner had no cognizable indemnity or other contractual obligation to pay Enterprise for damages arising from Cross's negligent conduct that ruptured Enterprise's umbilical.

156. Nonetheless, over a period of months as Enterprise incurred costs related to the replacement of its umbilical, Enterprise sent to Mariner a series of invoices for reimbursement of its expenditures.

157. Mariner, in turn, made demand upon Oceaneering.   By letter dated August 27, 2009, Mariner's Special Counsel advised Oceaneering that Enterprise had made a claim against Mariner for replacement of the severed umbilical 10923 and, citing Paragraph 9 of the Purchase Order, made formal demand on Oceaneering to indemnify Mariner for "all liability incident to the damaged . . . umbilical."

158. A week later, Oceaneering's General Counsel sent a letter to Cross demanding that Cross, pursuant to the Main Contract, Purchase Order, and Back to Back, indemnify Oceaneering and Mariner for the damages.

159. On July 15, 2010, according to Enterprise, a Mariner representative had told Enterprise that the accumulated invoices--which evidently included some invoices unrelated to the new umbilical--had been expedited for approval, but nearly two and a half months later--understandably--Mariner still had not paid them.

41

160. By letter dated September 27, 2010, Enterprise ratcheted up its demand on Mariner by stating that by October 8 it must pay invoices that then totaled $2,176,811, most of which pertained to replacement of Enterprise's 10923 umbilical, mentioned "the Owners' right to shut-in production and/or exercise of termination rights under Section 8.2(a)" of the Platform Processing Agreement when payments are 60 days past due, and stated that if payment was not received, "Enterprise shall consider Mariner to be in Default under the [Platform Processing] Agreement."

161. In the foregoing demand letter to Mariner, Enterprise cited clauses in the "Statements and Billings" and "Payments" sections of the Platform Processing Agreement, but Enterprise did not refer to any clause in the Platform Processing Agreement or any other agreement that bound Mariner to pay to Enterprise property damages resulting from a maritime tort committed by an independent subcontractor and for which Mariner was not liable.

162. After receiving Enterprise's letter threatening to shut-in Mariner's production, Mariner's outside counsel by letter dated October 1, 2010, demanded that Oceaneering pay $1,276,237.90 in damages sought by Enterprise for replacement of Enterprise's umbilical, specifically relying on and quoting from paragraph 9 of the Purchase Order, as follows:

> 9.  Indemnity: [Oceaneering] does hereby indemnify and save harmless [Mariner] and [Mariner's] Customer from and against all liability to others

and all claims, causes of action and suits of other
. . . for personal injury (including death) or
property damage, arising out of acts or omissions
to act of employees, contractors or agents of
[Oceaneering] . . . .

163. Mariner's October 1, 2010 demand letter to Oceaneering
further asserted that "Oceaneering agreed to indemnify and save
harmless Mariner from claims for property damage arising out of the
acts or omissions of Oceaneering's employees, contractors, or
agents."  Mariner's lawyers enclosed with their demand letter a
copy of Enterprise's letter dated four days earlier demanding a
total sum of $2,176,811 from Mariner.

164. A month after the October 8, 2010 "Default" date
specified by Enterprise, Enterprise wrote a new demand letter,
dated November 9, 2010, this time addressed not only to Mariner
but also to Oceaneering and, for the first time, to Cross.  The
November 9 letter demanded from all three parties "immediate
payment of amounts previously expended by Enterprise" to repair
"damages to the umbilical when an anchor of the Crossmar 14 became
fouled," which damages now were claimed to be $4,679,639.88.  The
November 9 demand letter no longer threatened to shut-in Mariner's
production or to declare Mariner in Default of the Platform
Processing Agreement.

165. Similar to its September 27 demand letter to Mariner,
however, Enterprise's November 9 demand letter again failed to cite
any contractual covenant or legal theory as to why either Mariner

43

or Oceaneering should be liable to Enterprise for maritime tort damages caused by the third party independent subcontractor, Cross.

166. Cross was the sole party responsible for conducting the anchor retrieval operations on January 9, 2009, and it was the negligent conduct of Cross's barge superintendent Sampey and tower winch operator Aucoin that was the sole cause of the damages to Enterprise's 10923 umbilical.

167. Cross at all times acted as an independent contractor when it conducted those anchor retrieval operations.

168. Neither Mariner nor Oceaneering exercised or asserted any control over Cross's anchor retrieval operations on January 9, 2009.

169. Neither Mariner nor Oceaneering is vicariously liable for the maritime tort damage to Enterprise's umbilical caused by Cross.

170. There is no evidence of any negligent conduct by Oceaneering that gave rise to Oceaneering having any maritime tort liability to Enterprise or to Mariner.

171. Oceaneering had no liability under contract or tort law to either Enterprise or Mariner for the damage to Enterprise's umbilical caused by the negligence of its independent subcontractor, Cross.

172. If Enterprise and Mariner had pursued their putative claims against Oceaneering, they would have been unable to prove

any damages sustained by either of them from any maritime tort committed by Oceaneering.

173. The Indemnity Clause in the Purchase Order, adopted in the Back to Back Agreement, does not require Cross to hold harmless or to indemnify Oceaneering for payments made by Oceaneering to settle claims for which there is no potential basis for the indemnitee's (Mariner's) liability.

174. Nonetheless, on November 15, the fourth business day after Enterprise signed its November 9 demand letter, Enterprise, Mariner, and Oceaneering all executed a Settlement Agreement of 17 pages pursuant to which Oceaneering paid to Enterprise on the spot--even to the last 88 cents--Enterprise's full demand of $4,679,639.88.

175. The circumstances of the November 9 demand letter--no longer threatening to shut-in Mariner's production or to declare Mariner in default of the Platform Processing Agreement (*see* FOF No. 164) followed by an almost instantaneous 17 pages long three-party Settlement Agreement excluding the tortfeasor Cross but paying in full the newly stated total demand of nearly $4.7 million--leads to the inevitable finding that the "settlement" was actually reached by Enterprise, Mariner, and Oceaneering before Enterprise ever served its November 9 demand letter on Cross.

176. As found below (FOF Nos. 185-192), there were compelling commercial reasons for Oceaneering's generous payment to Enterprise

45

that evidently obviated in Oceaneering's judgment any need to conduct careful liability and maritime tort damages analyses as to whether Mariner and Oceaneering were actually liable to Enterprise and the amount of maritime tort damages for which the tortfeasor Cross was actually liable.

177. Although the Indemnity Clause requires Oceaneering to "indemnify and save harmless [Mariner] . . . from and against all claims, . . ." to discharge that covenant Oceaneering is not required to pay to or on behalf of an indemnitee an unreasonable demand made under circumstances where the claim made against Mariner was one for which Mariner had no potential liability.

178. When an indemnitor pays to or in behalf of an indemnitee an unreasonable sum to settle a claim for which the indemnitee has no potential liability, the indemnitor acts as a volunteer.

179. Likewise, under the Back to Back, to discharge its indemnity covenant to Oceaneering under paragraph 9 of the Purchase Order, Cross is not required to indemnify Oceaneering, its indemnitee, for Oceaneering's payment "in cash, in lump sum, without discount" of the full amount of Enterprise's demand made against its indemnitee, Mariner, under circumstances where Mariner had no potential liability to Enterprise for the severed umbilical.

180. Alternatively, if Oceaneering had a reasonable basis to anticipate liability to Mariner under paragraph 9 of the Purchase Order (and the evidence shows none), then for Oceaneering to

46

recover as an indemnitee from its indemnitor, Cross, Oceaneering was required to act reasonably, that is, to settle the claim in light of the risk of exposure.

181. Oceaneering's payment to Enterprise, which had sustained maritime tort damages of approximately $2.1 million, of Enterprise's full demand of approximately $4.7 million "in cash, in lump sum, without discount," was an unreasonable payment bearing no relation to any reasonable expectation of liability exposure.

182. Oceaneering's settlement payment to Enterprise of $4,679,639.88 was unreasonable.

183. Cross has no duty under paragraph 9 of the Purchase Order to indemnify Oceaneering for an unreasonable payment made by its indemnitee, Oceaneering, to Enterprise.

184. Oceaneering has not proven itself entitled to recover any damages on its contractual indemnity claim.

<u>Reasons Oceaneering Paid the<br>$4,679,639.88 Demanded by Enterprise</u>

185. Mariner "lawyered up" with threats of litigation against Oceaneering on October 1, 2010, after Mariner received Enterprise's threat to shut-in Mariner's offshore production and declare Mariner in default of the Platform Processing Agreement.

186. Mariner knew that it was not liable to Enterprise for maritime tort damages committed by an independent subcontractor, but Enterprise had immense commercial leverage that it brought to

47

bear against Mariner by reason of Enterprise Field Services being
not only an owner but also the operator of the Garden Banks Block
72 platform under the Platform Processing Agreement.  Mariner, on
the other hand, was only a producer, dependent upon the Owners'
processing facilities to continue its own production.

187. Enterprise freely employed this leverage against Mariner
simply by "billing" Mariner for claimed tort damages inflicted
by Cross in the manner that the Platform Processing Agreement
evidently authorized Enterprise to bill Mariner for processing and
related services on the platform.  And then, when the tort damages
inflicted by the independent subcontractor Cross were not paid by
Mariner, Enterprise threatened Mariner with the draconian action of
shutting in its production just as if Mariner had defaulted on
contractual obligations to pay for processing under the Platform
Processing Agreement.

188. Mariner, in turn, was motivated to ramp up its pressure
on Oceaneering, which was the beneficiary of the ten years old Main
Contract with Mariner, pursuant to which Oceaneering from time to
time received from Mariner profitable purchase orders.  Mariner
also invoked and relied upon the Indemnity Clause in paragraph 9 of
the Purchase Order, asserting that Oceaneering was obligated to
hold harmless Mariner from "all claims" and Enterprise had made a
claim.

189. Oceaneering enjoyed highly profitable business relation-
ships not only with Mariner but also with Enterprise.  For example,
Enterprise chose Oceaneering to recover from the seabed the severed
two segments of the 10923 umbilical, and to provide and install the
new replacement umbilical, for which work Oceaneering was paid
approximately $3.8 million, with a profit margin of well more than
a half million dollars--all for repairing the damage done by its
own subcontractor, Cross.

190. Oceaneering's senior vice president of subsea services
testified that Oceaneering annually received approximately
$10 million in gross revenues from sales to Enterprise.

191. Oceaneering had compelling commercial reasons to
accommodate its long-time customers, both Mariner and Enterprise,
by paying "in cash, lump sum, without discount" Enterprise's full
demand, notwithstanding an absence of legal basis either in
contract or in tort for Enterprise to make such a demand against
Mariner or against Oceaneering.

192. Thus, six days after Enterprise made its ostensible
demand (*see* FOF Nos. 174, 175), Oceaneering wrote a check for the
full $4,679,639.88, took an assignment of claims, and sued Cross in
this case to recover the full sum.

## Oceaneering's Breach of Contract Claim
### (Third Cause of Action)

193. Oceaneering claims that Cross breached the Back to Back, which adopted the Main Contract, by failing to perform its services in a safe and workmanlike manner during retrieval of its anchors on January 9, and that Oceaneering is entitled to damages in the sum of $4,679,639.88.

194. Paragraph 10 of the Main Contract, as incorporated by the Back to Back Contract, provides:

> All work performed and services provided hereunder by or on behalf of [Cross] shall be done in a safe and workmanlike manner.  [Cross] warrants that it has trained each of its employees, agents and subcontractors to perform his work in a safe and competent manner and has taken all reasonable steps to assure that each person's actions do not endanger the safety of himself or others.

195. Pursuant to the Back to Back Contract, Cross was obligated to Oceaneering to perform its work in a safe and workmanlike manner.

196. Based upon the same Findings above with regard to Cross's negligence, Cross failed to perform its work in a safe and workmanlike manner in retrieving the Crossmar 14's port stern No. 4 anchor on January 9, 2009.  (*See* FOF Nos. 58-76).

197. Cross at all times acted as an independent subcontractor when its unsafe and unworkmanlike anchor retrieval caused property damage to Enterprise's property.

50

198. Cross's failure to perform its work in a safe and workmanlike manner caused no damages to Oceaneering.

199. If Oceaneering did sustain any loss or damage to its property from Cross's unsafe and unworkmanlike anchor retrieval, Oceaneering in the Back to Back, and its incorporated Main Contract, released and agreed to hold Cross harmless from liability for such. (*See* FOF Nos. 135, 137, 141-146).

200. To the extent that Oceaneering contends that its November 15, 2010 payment of $4,679,639.88 to Enterprise constitutes economic damages to Oceaneering based on Cross's failure to perform in a safe and workmanlike manner, that payment--voluntarily made by Oceaneering without any showing of Oceaneering's liability for Enterprise's loss--was not a foreseeable result of Cross's breach of contract 22 months earlier.  Cross's failure to perform in a safe and workmanlike manner did not proximately cause Oceaneering to pay nearly $4.7 million to Enterprise. (*See also* FOF Nos. 175, 176, 185-192).

201. Oceaneering is entitled to no recovery on its breach of contract claim against Cross.

## Cross's Counterclaim

202. Cross counterclaims against Oceaneering for breach of contract, alleging that the Purchase Order, incorporated into the Back to Back, requires Oceaneering to indemnify and hold harmless

51

Cross "from and against any and all claims, losses or damages arising from uncharted debris or pipelines not located in accordance with the latest survey data during the performance of the work."

203. As previously found, the 10923 umbilical was in its charted location when it was snagged by Cross's anchor. (*See* FOF Nos. 55-57).

204. None of the property loss or damage proven in this case arose "from uncharted debris or pipelines."

205. Oceaneering did not breach the Back to Back or Purchase Order with respect to indemnifying or holding harmless Cross from uncharted debris or pipelines not located in accordance with the latest survey data.

## Conclusions of Law

**The Court makes the following conclusions of law:**

1.   The Court has jurisdiction of the parties and of the subject matter of this case pursuant to 28 U.S.C. § 1333.

2.   As Enterprises's subrogee/transferee/assignee, and in its own right, Oceaneering alleges causes of action against Cross for negligence ("Second Cause of Action"), contractual indemnity ("First Cause of Action"), and breach of contract ("Third Cause of Action").   Cross counter-claims against Oceaneering, alleging breach of contract for failure to indemnify.

Negligence (Oceaneering's Second Cause of Action)

3.    To establish maritime negligence, a plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, the defendant breached that duty, the plaintiff sustained injury, and there was a causal connection between the defendant's conduct and the plaintiff's injury.  Canal Barge Co., Inc. v. Torco Oil Co., 220 F.3d 370, 376 (5th Cir. 2000).

4.    "Determination of the tortfeasor's duty, and its parameters, is a function of the court.   That determination involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party."  Consol. Aluminum Corp. v. C.F. Bean Corp., 833 F.2d 65, 67 (5th Cir. 1987) (citations omitted).

5.    Duty is measured by the scope of the risk that negligent conduct foreseeably entails.   Id.

6.    The Louisiana Rule creates a rebuttable presumption that in allisions involving a drifting vessel, the drifting vessel is at fault.  The Louisiana, 70 U.S. 164 (1865); Combo Mar., Inc. v. U.S. United Bulk Terminal, LLC, 615 F.3d 599, 602 (5th Cir. 2010).

7.    The presumption of the Louisiana Rule applies to allisions with sunken stationary objects only when the party in control of the vessel "knew or should have known" of the existence of the stationary object.  Contango Operators, Inc. v. United States, 965 F. Supp. 2d 791, 812 (S.D. Tex. 2013) (Lake, J.)

53

(citing <u>Delta Transload, Inc. v. Motor Vessel, Navios Commander</u>, 818 F.2d 445, 451 (5th Cir. 1987)).   The party invoking the presumption has the burden of proving either visibility or knowledge.   <u>Id.</u> (citing <u>Delta Transload</u>, 818 F.2d at 450-51).

8.   The <u>Louisiana</u> Rule applies in this case (*see* FOF Nos. 13, 15, 53-57), and Defendant Cross failed to present evidence sufficient to rebut the presumption.

9.   The common law negligence doctrine of proximate causation applies in admiralty.   <u>Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM</u>, 447 F.3d 360, 367 (5th Cir. 2006) (citing <u>Exxon Co., U.S.A. v. Sofec, Inc.</u>, 116 S. Ct. 1813, 1817-18 (1996)).   Cross's negligence was the sole proximate cause of the Crossmar 14's No. 4 anchor fouling Enterprise's subsea umbilical 10923, and of Enterprise's resulting property damages.   (*See* FOF Nos. 58-83).

### Oceaneering and Mariner Have No Vicarious Liability

10.   Applying the general maritime law, the Fifth Circuit "has consistently held that a principal who hires independent contractors over which he exercises no operational control has no duty to discover and remedy hazards created by its independent contractors," and accordingly cannot be held vicariously liable for the torts of the independent contractors.   <u>Wilkins v. P.M.B. Sys. Eng'g, Inc.</u>, 741 F.2d 795, 800 (5th Cir. 1984) (citing <u>Wallace v. Oceaneering Int'l</u>, 727 F.2d 427 (5th Cir. 1984); <u>Moser v. Texas</u>

54

<u>Trailer Corp.</u>, 623 F.2d 1006, 1014-15 (5th Cir. 1980); W. Prosser, The Law of Torts § 71 (4th ed. 1971); Restatement (Second) of Torts §§ 409, 414, comment at 388 (1965)).

11.   An exception to this general rule occurs only where the principal, despite the independent contractor arrangement, actually retains some degree of control over the manner or methods by which the contractor does his work.   <u>Id.</u>

12.   In determining whether the principal retained control over the independent contractor's work methods,

> [i]t is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations.   Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail.   There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

<u>Id.</u> (quoting Restatement (Second) of Torts § 414, comment c). *Compare* <u>Wallace</u>, 727 F.2d at 436-37 (no vicarious liability where principal's "company man" on site "had no actual control over or responsibility for the details of the drilling and diving work, but merely inspected the progress," independent contractors had separate supervisors who "called the shots," and principal's agent, despite having authority to order the work stopped for safety reasons, did not control the operation of the particular procedure

55

in which plaintiff was injured), *with* <u>Texas E. Transmission Corp.</u> <u>v. McMoRan Offshore Exploration Co.</u>, 877 F.2d 1214, 1222 (5th Cir. 1989) (principal's agent assumed "actual operational control over the work of the independent contractor" when he intervened in anchor raising operation and then directed resumption of retrieval with as much information about the situation as independent contractors, despite contract provision that principal had "no operational control" over independent contractor).

13.  Cross at all times acted as an independent subcontractor, neither Oceaneering nor Mariner assumed any operational control over Cross's anchor retrieval operations on January 9, 2009, and neither Oceaneering nor Mariner has vicarious liability to Enterprise for the damages caused to Enterprise's umbilical by Cross's negligence.  (*See* FOF Nos. 77-83, 166-169).

<u>Damages for Negligence</u>

14.  The purpose of compensatory damages in tort cases is to place the injured person as nearly as possible in the condition he would have occupied if the wrong had not occurred.  <u>Freeport</u> <u>Sulphur Co. v. S/S Hermosa</u>, 526 F.2d 300, 304 (5th Cir. 1976).

15.  The plaintiff bears the burden of proof to show the amount, as well as the fact, of damages.  <u>Pizani v. M/V Cotton</u> <u>Blossom</u>, 669 F.2d 1084, 1088 (5th Cir. 1982).

16.  Damages need not be proved with an exact degree of specificity.  *Mitsui O. S. K. Lines, K. K. v. Horton & Horton, Inc.*, 480 F.2d 1104, 1106 (5th Cir. 1973).  It suffices if a state of facts is shown from which a court can find with reasonable certainty that the damages claimed were actually or may be reasonably inferred to have been incurred as a result of the collision.  *Id.*

17.  When there is a tortious injury to property and the market value of that property is unknown, the amount of damages must be determined by the cost of repairs to or replacement of the property.  *Freeport Sulphur*, 526 F.2d at 304; *Pillsbury Co. v. Midland Enters., Inc.*, 715 F. Supp. 738, 764 (E.D. La. 1989) ("Where the owner had used the property for a special use or where there otherwise may be no true market, replacement costs may be the most accurate basis for determining damages."), *aff'd and remanded* 904 F.2d 317 (5th Cir. 1990) (citing *King Fisher Marine Serv., Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1185-87 (5th Cir. 1984)).

18.  The new-for-old rule provides that a party suffering injury is entitled to recover only that which is necessary to restore his damaged property to the same condition as existed immediately before the delict.  *City of New Orleans for Use & Benefit of Sewerage & Water Bd. of New Orleans v. Am. Commercial Lines, Inc.*, 662 F.2d 1121, 1124 (5th Cir. 1981).  This rule is designed to avoid giving the injured person a windfall by

57

furnishing something entirely new for that which was old and depreciated and would in the normal course of things have to be replaced in any event.  Id. (citing <u>State Highway Comm'n v. Tug Go-Getter</u>, 468 F.2d 1270, 1273 (9th Cir. 1972)).

19.  Thus, where repair or replacement costs form the basis of the damage award, the Court must determine whether the repair or replacement adds new value to or extends the useful life of the property; if so, an appropriate reduction from the full repair or replacement costs should be made.  <u>Pillsbury</u>, 715 F. Supp. at 764 (citations omitted); <u>Gulf States Utilities Co. v. M/V SS Chilbar</u>, 986 F.2d 1418, at *2 (5th Cir. 1993) (unpublished) (no depreciation where repair of damaged wall would not add value or extend useful life) (citing <u>Pizani</u>, 669 F.2d at 1088; <u>Freeport Sulphur</u>, 526 F.2d at 304).

20.  When the repair or replacement of the damaged property extends the useful life of the property, but to a different degree from the expected useful life of the property when it was first acquired by the plaintiff, the percentage of useful life extension is required to be determined.  <u>Freeport Sulphur</u>, 526 F.2d at 306; <u>Pillsbury</u>, 715 F. Supp. at 764.

21.  The "percentage of useful life extension" is the portion of the total useful life of the repaired property that the useful life extension constitutes.  <u>Freeport Sulphur</u>, 526 F.2d at 306.

The allocable cost of the useful life extension may be derived by multiplying this percentage by the total repair expenses.  Id.

22.  "If this allocable cost is then deducted from the total cost of repairs, the resulting damages award will precisely compensate the plaintiff for the cost of restoring his property to its precollision condition."  Id.

23.  This formula applies--as in this case--when the principal or only betterment to the plaintiff's property is the extension of its useful life.  Id.  (See FOF Nos. 97, 103, 104).

24.  Depreciation under the new-for-old rule applies to the entire cost of replacement, including surveying and other incidental costs associated with replacement.  See Pillsbury, 715 F. Supp. at 768-69 (deduction for depreciation applies to engineering and surveying costs, which, like construction costs, "help provide plaintiffs with two structures that will presumably have useful lives that extend further into the future than would have the two present structures without the allisions.").

25.  Where the repairs do not extend the useful life of the property as it existed just before the collision, there should be no deduction for depreciation.  Brunet v. United Gas Pipeline Co., 15 F.3d 500, 505 (5th Cir. 1994); Cargill, Inc. v. Kopalnia Rydultowy Motor Vessel, 304 F. App'x 278, 280 (5th Cir. 2008).

26.  Repairs do not extend the useful life of an integral part of a structure if that part would have to be replaced when the

59

entire structure is replaced.  *See* <u>Brunet</u>, 15 F.3d at 505-506 (no depreciation applied to damaged pipeline crossing because new crossing would have to be replaced when the pipeline is replaced); <u>Cargill</u>, 304 F. App'x at 281 (damaged walkway was essential part of wharf, and would most likely be replaced when the wharf is replaced).

27.  A tortfeasor bears the burden to show that the victim of its tortious conduct failed to mitigate damages.  The tortfeasor must demonstrate (1) that the injured party's conduct after the accident was unreasonable and (2) that the unreasonable conduct had the consequence of aggravating the harm.  <u>Marathon Pipe Line Co. v. M/V Sea Level II</u>, 806 F.2d 585, 592 (5th Cir. 1986).

28.  Applying the Fifth Circuit's rule (<u>Freeport Sulphur Co.</u>, 526 F.2d 300, 301) for the calculation of depreciation in connection with the substantial betterment received by Enterprise when its damaged umbilical was replaced, results in recoverable damages of $2,105,838 to Enterprise as a result of Cross's maritime tort.  (*See* FOF Nos. 98-105).

<u>The Validity of Enterprise's Assignment of
Its Negligence Claim to Oceaneering</u>

29.  Oceaneering brings its negligence claim as the transferee/assignee and conventional subrogee of Enterprise, pursuant to the Settlement Agreement made by them and Mariner.

60

30.   Under the general maritime law, "the assignment of tort claims from the injured party to one tortfeasor permitting the settling defendant to proceed against a co-tortfeasor is invalid." Ondimar Transportes Maritimos v. Beatty St. Properties, Inc., 555 F.3d 184, 189 (5th Cir. 2009).

31.   The Fifth Circuit regarded its holding in Ondimar as a corollary to the proportionate fault rule on partial settlements announced by the Supreme Court in McDermott, Inc. v. AmClyde, 114 S. Ct. 1461 (1994).  The McDermott rule applies only to settlements involving joint tortfeasors.  See Westinghouse Credit Corp. v. M/V New Orleans, 39 F.3d 553, 555 (5th Cir. 1994) (McDermott rule "applies only to cases in which there has been a settlement by a joint tortfeasor"); Boykin v. China Steel Corp., 73 F.3d 539, 544 (4th Cir. 1996) (McDermott rule does not apply where "Bergesen and the steel defendants are not joint tort-feasors.  Even in the face of a claim that they might have been, Bergesen has been found not a tort-feasor as a matter of fact and not guilty of any fault.").

32.   The rationale of Ondimar was premised on settlements made by joint tortfeasors.  See Ondimar, 555 F.3d at 188 ("We see no advantage in allowing defendants responsible for the plaintiff's injuries a right to, in effect, buy the plaintiff's claims and prosecute the other jointly responsible parties.") (emphasis added) (quoting Beech Aircraft Corp. v. Jinkins, 739 S.W.2d 19 (Tex. 1987)).

61

33.  On the other hand, while finding it unnecessary to determine under the facts of <u>Ondimar</u>, the Fifth Circuit stated that "our research suggests that most state courts which have considered [whether the assignment of property damage tort claims are generally prohibited] permit such assignments." <u>Ondimar</u>, 555 F.3d at 187 (citing numerous state cases).  "We look to the common law as a 'guide to interpretation of federal admiralty principles.'" <u>Id.</u>, at 187 n.2 (citation omitted).

34.  Enterprise's sale, assignment, and transfer of its tort claim against Cross to Oceaneering, which was not a co-tortfeasor with Cross, was valid.

35.  Cross's negligence in retrieving the port stern No. 4 anchor on January 9, 2009, was the sole proximate cause of Enterprise's property damage and loss.  (*See* FOF Nos. 58-83). Cross was an independent contractor and neither Oceaneering nor Mariner was vicariously liable to Enterprise for Enterprise's damages.  (*See* FOF Nos. 77-83, 166-169; COL Nos. 10-13).  Enterprise's damages from the tort were $2,105,838.  (*See* FOF Nos. 98-105).  By reason of Enterprise's sale, assignment, and transfer of its tort claim to Oceaneering, Oceaneering is entitled to recover from Cross $2,105,838, plus prejudgment interest from the date of the injury.

<u>Contractual Indemnity (Oceaneering's First Cause of Action)</u>

36.   A maritime contract containing an indemnity agreement should be read as a whole and its words given their plain meaning unless the provision is ambiguous. <u>Becker v. Tidewater, Inc.</u>, 586 F.3d 358, 369 (5th Cir. 2009) (citing <u>Weathersby v. Conoco Oil Co.</u>, 752 F.2d 953, 955 (5th Cir. 1984)).

37.   Under federal maritime law,

> [a] contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties, but it should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage.

<u>Fontenot v. Mesa Petroleum Co.</u>, 791 F.2d 1207, 1214 (5th Cir. 1986) (quoting <u>Corbitt v. Diamond M. Drilling Co.</u>, 654 F.2d 329, 333 (5th Cir. 1981)).

38.   Although the general rule requires an indemnitee to show actual liability on his part to recover against an indemnitor, "a defendant need only show potential (rather than actual) liability to recover indemnity where . . . the defendant's claim is based on a written contract of insurance or indemnification" and the settlement is reasonable. <u>Fontenot</u>, 791 F.2d at 1216-17 & n.12 (settling defendant had "reasonable apprehension of its own liability" and was entitled to indemnity under agreement, where no

63

party had suggested settlement was unreasonable) (citing <u>Terra Resources, Inc. v. Lake Charles Dredging & Towing, Inc.</u>, 695 F.2d 828, 832 (5th Cir. 1983)).

39.   A court confronted with a valid indemnification agreement "should insure that the claim was not frivolous, that the settlement was reasonable, that it was untainted by fraud or collusion, and that the indemnitee settled under a reasonable apprehension of liability." <u>Id.</u> at 1218; <u>Bourg v. Chevron U.S.A. Inc.</u>, 91 F.3d 141, at *3 (5th Cir. 1996) (unpublished) (quoting <u>Fontenot</u>, 791 F.2d at 1218).

40.   "[A] settlement must be reasonable before indemnity is owed." <u>Conoco Inc. v. Boh Bros. Const. Co.</u>, 191 F.R.D. 107, 114 (W.D. La. 1998) (citing <u>Parfait v. Jahncke Service, Inc.</u>, 484 F.2d 296, 301 (5th Cir. 1973) (indemnitee bears the burden of showing that it "acted in accordance with equitable indemnity principles in making the settlement and had not spent its indemnitor's money too freely.")). *See also* <u>S. California Gas Co. v. Syntellect, Inc.</u>, 534 F. App'x 637, 639 (9th Cir. 2013) ("The settlement is presumptive evidence of liability of the indemnitee and the amount of liability, but it may be overcome by proof from the indemnitor that the settlement was unreasonable") (citing <u>Peter Culley & Assocs. v. Superior Court</u>, 10 Cal. App. 4th 1484, 1497 (1992)); <u>Tokio Marine & Fire Ins. Co. v. Rosner</u>, 206 F. App'x 90, 95 (2d Cir. 2006) ("To procure indemnification for an underlying claim

64

that was voluntarily settled, the indemnitee must demonstrate, inter alia, that the settlement amount was reasonable."); Hitt v. Cox, 737 F.2d 421, 426 (4th Cir. 1984) (insurer not liable to indemnify for unreasonable portion of settlement).

41. Reasonableness ordinarily is to be measured by the extent of financial exposure the settling party faces in the court where he will have to litigate if he does not settle. Mathiesen v. Panama Canal Co., 551 F.2d 954, 957 (5th Cir. 1977) (settlement accepting liability for 70% of damages was reasonable where Dutch court would probably have assigned 75% liability); Molett v. Penrod Drilling Co., 919 F.2d 1000, 1006 (5th Cir. 1990) (citing Mathiesen, 551 F.2d at 957); see also Damanti v. A/S Inger, 314 F.2d 395, 397 (2d Cir. 1963) (reasonableness of settlement evaluated "in view of the size of possible recovery and degree of probability of claimant's success") (quoted in Mathiesen, 551 F.2d at 957).

42. When the parties differ sharply in their contentions about liability and damages, it may be "impossible to fix a reasonable settlement amount with anything approaching mathematical precision," such that "[t]he calculation of a reasonable settlement amount necessarily must be resolved by an exercise in judgment." Molett, 919 F.2d at 1009 (district court's finding of reasonable-ness not clearly erroneous).

43.  Once the indemnitee shows it is potentially liable, the indemnitor bears the burden to show that the amount of the settlement was unreasonable.  Wisconsin Barge Line, Inc. v. Barge Chem 300, 546 F.2d 1125, 1129-30 (5th Cir. 1977).  If the settlement is reasonable, the indemnitor must indemnify the indemnitee for the settlement amount.

44.  Mariner had no potential liability to Enterprise in contract or in tort for Enterprise's property damage caused by an independent subcontractor. (See FOF Nos. 77, 78, 81, 83, 127-129, 153-155, 166-169).  Oceaneering knew or upon inquiry should have known that Enterprise's claim against Mariner had no basis in contract or tort, and Oceaneering knew that it had no liability to Enterprise in contract or in tort for the tort committed by its independent subcontractor Cross.

45.  Oceaneering's payment to Enterprise to satisfy a claim against Mariner for which Mariner had no potential liability was not reasonable.

46.  Alternatively, if Oceaneering as indemnitee of Cross had shown that it was potentially liable to Mariner--presumably to indemnify and hold harmless Mariner from Enterprise's claim, which claim against Mariner had no basis either in tort or contract--then Oceaneering's payment "in cash, in lump sum, without discount" of $4,679,639.88 to Enterprise--far more double the amount of

Enterprise's $2,105,838 tort damages that it could have recovered from Cross--was a wholly unreasonable indemnity payment.

47. Oceaneering made the payment--unreasonable under an indemnity proviso--for separate commercial reasons related to its own ongoing lucrative business relationships with both Enterprise and Mariner. (*See* FOF Nos. 185-192).

48. Cross did not breach its contractual indemnity covenant under the Back to Back and Purchase Order by refusing to pay to Oceaneering $4,679,639.88.

## Breach of Contract (Oceaneering's Third Cause of Action)

49. The interpretation of both the Back to Back and the Main Contract is governed by principles of the general maritime law and the admiralty and maritime laws of the United States.  In the event the laws of any state otherwise may apply, the Main Contract and the Back to Back are governed by Texas law to the extent not inconsistent with or superseded by the general maritime law.[1]

50. The core principles of Texas contract law are consistent with the general maritime law with respect to Oceaneering's breach of contract claim.  *See* N. Ins. Co. of New York v. Pelican Point Harbor, Inc., 3:05CV184MCR/MD, 2006 WL 1285078, at *5 (N.D. Fla. May 5, 2006) (looking to "not inconsistent" Florida law for

---

[1] Main Contract, ¶ 36.

elements of breach of contract claim governed by general maritime law).

51.  "[T]he essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." Smith Int'l, Inc. v. Egle Grp., LLC, 490 F.3d 380, 387 (5th Cir. 2007) (quoting Valero Mktg. & Supply Co. v. Kalama Int'l, LLC, 51 S.W.3d 345, 351 (Tex. App.-Houston [1st Dist.] 2001)).

52.  "Where a [maritime] contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed together." Cargill, 304 F. App'x at 282.  Thus, the Back to Back is construed just as the Main Contract, and proof of damages is an essential element to Oceaneering's breach of contract claim against Cross.

53.  Admiralty law recognizes an implied warranty of workmanlike service which arises from contractual relationships, Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc., 866 F.2d 752, 763 n.17 (5th Cir. 1989) (citing Ryan v. Pan-Atlantic S.S. Corp., 76 S. Ct. 232, 237-38 (1956)), which "means that the obligor in a service contract has the duty to perform his services with reasonable care, skill, and diligence." Kevin Gros Offshore,

LLC v. Max Welders, Inc., CIV.A.07-7340, 2009 WL 152134, at *4 (E.D. La. Jan. 22, 2009).

54.  In an action for breach of contract, damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.  Restatement (Second) of Contracts § 351 (1981).  The requirement of foreseeability in a breach of contract case "is a more severe limitation of liability than is the requirement of substantial or 'proximate' cause in the case of an action in tort or for breach of warranty."  Migerobe, Inc. v. Certina USA, Inc., 924 F.2d 1330, 1338 (5th Cir. 1991) (citing Restatement (Second) of Contracts § 351, comment a).

55.  In admiralty, "the guilty party is liable for all foreseeable and proximately caused losses incurred by the innocent party" as a result of breach of the warranty of workmanlike performance.  1 Admiralty & Mar. Law §5-9 (5th ed.) (citing Fed. Barge Lines, Inc. v. Granite City Steel, Div. of Nat. Steel Corp., 608 F. Supp. 142, 149 (E.D. Mo. 1985) ("A breach of the stevedore's warranty extends liability for all foreseeable and proximate losses incurred as a result of the stevedore's negligence")).

56.  Oceaneering did not sustain damages to its own property as a result of Cross not performing in a good and workmanlike manner during Cross's fateful anchor retrieval efforts on January 9, 2009.  (See FOF Nos. 198, 199).

57.  Cross, when it breached its contractual duty to perform its anchor retrieval work in a safe and workmanlike manner and caused $2.1 million in damages to Enterprise's umbilical, had no reason to foresee that a probable result of its breach would be for Oceaneering about two years later--driven by significant business and commercial reasons of its own--to purchase for nearly $4.7 million Enterprise's maritime tort claim and seek to recover that sum from Cross as breach of contract damages. (*See* FOF Nos. 185-192, 200).

58.  Oceaneering is entitled to no recovery from Cross for breach of contract because Oceaneering did not sustain damages as a result of Cross's failure to perform its work in a safe and workmanlike manner.

## Prejudgment Interest

59.  It is a "bedrock premise" in maritime tort actions under the general maritime law that an award for prejudgment interest is the rule rather than the exception; prejudgment interest must be awarded unless unusual circumstances make an award inequitable. Ryan Walsh Stevedoring Co., Inc. v. James Marine Servs., Inc., 792 F.2d 489, 492 (5th Cir. 1986).

60.  Admiralty courts have broad discretion in setting the prejudgment interest rate.  Platoro Ltd., Inc. v. Unidentified Remains of a Vessel, Her Cargo, Apparel, Tackle, & Furniture, in a

70

Cause of Salvage, Civil & Mar., 695 F.2d 893, 907 (5th Cir. 1983)
("[w]e cannot . . . instruct the district court to use any
particular rate; the decision in the first instance must lie with
the district court after it evaluates the circumstances of the
case."); Todd Shipyards Corp. v. Auto Transp., S.A., 763 F.2d 745,
753 (5th Cir. 1985) (affirming use of state interest rate
compounded daily to account for uncommonly high rate of return
during that period); *see also* Complaint of M/V Vulcan, 553 F.2d
489, 491 (5th Cir. 1977) (affirming award of interest at rate
equivalent to injured party's actual cost of borrowing); Reeled
Tubing, Inc. v. M/V Chad G, 794 F.2d 1026, 1029 (5th Cir. 1986)
(affirming prejudgment interest at federal statutory post-judgment
interest rate).

61.   The years since the subject maritime tort occurred on
January 9, 2009, have been an unprecedented prolonged period of low
interest rates.  No evidence was presented at trial by either party
as to a reasonable rate of prejudgment interest, and the Court
therefore has taken judicial notice of several published
benchmarks.  The Texas post-judgment interest statute--which also
applies to prejudgment interest--is premised on a benchmark rate of
interest that a money judgment creditor might have to *pay* to borrow
the unpaid amount of the judgment.  *See* TEX. FINANCE CODE, §§ 304.003,
304.103 (Vernon 2006).  The Texas statute adopts as its standard
the prime rate as published by the Board of Governors of the

71

Federal Reserve System, but with a floor of 5%.  Id.  According to the Federal Reserve, the prime rate has been 3.25% throughout this period since 2009.  On the other hand, the federal post-judgment interest statute is premised on the interest rate that a money judgment creditor might *earn* on the money if he had the money in hand.  Thus, during the past nearly five and one-half years, the 1-year constant maturity Treasury yield, which Congress adopted for the federal post-judgment rate, *see* 28 U.S.C. § 1961(a), has overall had a weekly average of less than 0.25%, and today is 0.09%.  The 5-year Treasury Bond yield rate compiled by the Department of the Treasury, appears overall to have had a daily rate average of less than 1.75% during this period.  The 5-year "Jumbo CD" interest rate, for CDs of at least $100,000, according to data compiled from commercial banks by the Federal Deposit Insurance Corporation, appears overall to have averaged less than 1.5%.

62.  Having considered a range of interest data and, as well, the circumstances of this case, the Court finds that a simple rate of interest of 2% per annum from the date of injury to the date of judgment is fair and just.

63.  On Enterprise's maritime tort damages of $2,105,838.00, Plaintiff as purchaser and assignee of Enterprise's claim is entitled to recover prejudgment interest in the amount of $227,199.73, which results in a total judgment of $2,333,037.73.

72

## Conclusion and Order

64.  If any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such; and if any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

65.  Based on the foregoing Findings of Fact and Conclusions of Law, it is ORDERED that Plaintiff Oceaneering International, Inc. shall have and recover from Defendant Cross Logistics, Inc. the total sum of TWO MILLION THREE HUNDRED THIRTY-THREE THOUSAND THIRTY-SEVEN and 73/100 DOLLARS ($2,333,037.73).  A separate Final Judgment will be entered.

The Clerk shall notify all parties and provide them with a true copy of these Findings of Fact and Conclusions of Law.

SIGNED at Houston, Texas, on this 2nd day of June, 2014.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

73